Let me say this. We've only taken up two minutes or so of Mr. Wininger's argument, so what we'll do, although I may be tiring out the panel and the advocates, I'll just ask Mr. Wininger to start over again so that Ms. Lindsley can hear the full argument. Of course, Your Honor. And let me know when you want me to commence. You can commence now. Thank you. Just starting out by saying that of the three cases we have here today, Taamneh is the most straightforward case and for several reasons. One is we only have one claim in Taamneh, and that is the secondary liability claim under 2333D. Number two is no one disputes that this is an ISIS attack in Istanbul, Turkey. Three is the causation, and this is where I know Judge Berzon and I started conversing, but there's no issue as to the causation. Defendants don't contest that we plausibly allege causation because causation runs whether you're looking at a direct liability claim, which we don't have in this case, or an indirect secondary liability claim, which we do have in this case. The causation always runs from the act of international terrorism. In the direct liability – I'm sorry. Sorry. Yes, Judge Kristen. In this case – you heard the last argument, I'm sure. There's quite a discussion about what's the act of international terrorism. In this case and in your case, how do you define it, please? The act of international terrorism in this case is the ISIS shooting at the Reyna nightclub in Istanbul, Turkey on January 1, 2017. That is the act of international terrorism. Period. ISIS is the – right, period. That is the act of international terrorism. Okay. All right. ISIS is the one who perpetrated this attack. And therefore, in our allegations and our complaint, when we say that the injuries were caused by the act of international terrorism, we plausibly establish that under any standard, whether it's fields or any other standard. It could even be before causation because the ISIS attack caused the injuries to my client. And there's no dispute about that. As to another undisputed issue, which is whether this attack was an act of international terrorism, the defendants appear to concede that point as well. They don't argue that this is not an act of international terrorism. But at least with respect to the first argument, and I can tell that there's a lack of clarity here, which I will do my best to try to dispel. And that is this. What do you mean by the first argument? The first argument that is preceded in mind in the Gonzales case. Oh, I see. Yeah, I'm sorry. Yeah. The oral argument, to be specific. The substantial assistance. Let me be clear. The substantial assistance does not mean to run to the actual attack. The substantial assistance does not mean to run to the individual ISIS operative that perpetrated the attack. The substantial assistance must run to, under the specific words of the statute, the person who committed the act of terrorism. And the person, quote, unquote, statutory term, who committed the act of international terrorism is ISIS. Okay, so hold on. Hold on. Right there. We're talking about 2333D2, right? Right. Okay. And the premise, the introduction says, in an action under subsection A for injury arising from an act of international terrorism. And then it goes on from there. Does that change your answer? No, because technically we could have brought a direct liability claim against ISIS. We're not going to do that because we'd have a mighty hard time recovering from ISIS. But what we can do is hold the secondary party responsible, and the secondary party is the Google, Facebook, and Twitter of the world that substantially assists ISIS in carrying out their overall terrorist activities. That is something I want to make sure that we can help. So there are two pieces. I mean, it's becoming clearer as you go through the argument. I think you're being helpful in pinpointing it. So then there are still two forks. A, let's assume you're right, and I think you have a plausible argument. You still have to knowingly provide substantial assistance. Correct. Right? And two, we have the halperstam, the odd incorporation of a case into the enacted statute. And what do we do with that in terms of, for example, the language in halperstam about the principal violation? Sure. I'm just curious, what exactly is your specific question with respect to that aspect of the statute? I want to know how you demonstrate here that what Google does have to have done is knowingly provide substantial assistance. Let's say it's ISIS. I understand your argument that it's ISIS. Secondly, we have this halperstam problem, which does seem to in some respect get to a connection, assuming that it's incorporated, even though it isn't actually there, that some connection to something called the principal violation or intended to be the principal violation. So there's some mens rea, as Judge Crystal was saying earlier. There are two mens reas. One we can assume was met, this general awareness of their role. But the second, what about the second? Sure. The second mens rea, I want to be clear for the panel. The second mens rea that we're then referring to is the mens rea that's in the six-factor test that's in halperstam that unfolds from the substantial assistance prompt. So just the framework is there's three elements. The third element is knowingly providing substantial assistance. The next third prompt unfolds into a six-factor test. Within one of those six factors, the sixth factor is a mens rea requirement. And we touched upon this in our brief. The defendants made the point that somehow there are two different mental states that are at play here. That's not true, as we said in our brief. There is one mental state, and that mental state is you need to have a general awareness as a secondary actor, a general awareness of your role in the primary actor's overall conduct. However, if we take a look at Lynn in Second Circuit, I do want to modify a little bit what we said in our brief. The mens rea requirement, even though it's one standard, which is the general awareness state, if by chance you do have evidence that the secondary actor evidence intent to actually further the aims of the primary actor, that suffices too. Great. Add that in there. So in other words, it doesn't exclude evidence of intent, but what the mens rea and the six-factor test, what is sufficient to satisfy that standard, is the general awareness process. And I believe if you take a look at the Lynn opinion in footnote 10, that's exactly what the Second Circuit was saying, was that general awareness is enough to satisfy these mens rea requirements. So the general awareness, if I could, counsel, forgive me, the general awareness requirement is the awareness of someone's role in the overall scheme. That's what you're talking about. That's the middle song of Halberstam. But to be more specific, it's the general awareness of the secondary actor's role in the overall scheme. Right. And to be more specific still, I'm trying to call your attention, if I could please, to the fact that 2333G, the entire thing, is premised on A, 2333A, which is any national of the United States injured in his or her person, property, or business. Right? So we're talking about, this goes back to Judge Berzon, what we're struggling with in the Halberstam is this wife, you know, was she aiding and abetting her husband? How much did she know about the murder that was going to go on as a result of his string of burglars? Right? And did she have to know more than, did she have to know about that burglar or that incident? So loosely translated, that's the guidance we have. And we're trying to figure out what the extent of this mens rea and the connection does it have to be to the actual, you know, shooting, murder that's alleged in each of these three cases. And so on my scorecard, it is terribly important that 2333D, secondary liability that we're talking about, is premised on A, 2333A, because this talks about the cause of action arising from injury to a person. That's true. It does. Could you speak to that? Absolutely. And this is our position, which is that if you're talking about the injury, right, the injury has to come from the act of international terrorism. In this case, it is the shooting. That is the act of international terrorism. All right. Causation flows from there. Causation flows from there to the injuries to my clients. Here, there's no question that there's causation. However you want to define that, whether it's fields, a stricter standard, or a looser standard, there's no question the ISIS attack in Istanbul injured my clients. When it then comes to the substantial assistance, okay, the question then becomes, did Google, Facebook, and Twitter provide substantial assistance to ISIS? Even according to Halberstadt, the Google, Facebook, and Twitter do not need to actually provide assistance in a way that facilitates this actual attack. And the reason why I know that? Why not? Why not? Because if you look at the blueprint, as we've been mentioning, the blueprint for aiding and abetting liability in this context, not criminal aiding and abetting liability, which is what Google was talking about in the prior oral argument. In this context, the blueprint is undoubtedly Halberstadt. And Halberstadt itself said the Whites did not need to know about the actual shooting that resulted in the decedent's death. It was very clear. Halberstadt mentioned in evaluating its own factors that their companions knew about a long-running burglary enterprise, a five-year-long burglary campaign against private homes, and an ongoing illicit enterprise. And she was a part of that ongoing illicit enterprise. So, again, I don't want to take up too much of your time because we covered this earlier, but my view is she was the back end of that operation. She was basically the money launderer. And do you want to maybe talk about how, if you're going to the six factors, which is what I think you're doing, you're going to the substantiality of the material support, you're distinguishing the defendant's conduct here in what ways? Which factors do you look to? I would look to – I mean, the only one that really doesn't apply is Google. And I'll just call my defendants. The defendant's presence is obviously not there. But when it comes to the amount of assistance, which is critical, obviously, to substantial assistance, the defendants are providing a service. And we highlighted these figures in our brief. Comparable to what, let's say, Congress appropriates for Radio Free Europe or Radio Free Asia, Radio Free Asia gets about $43.1 million. That was for fiscal year 2018. If you look at Radio Free Europe, I think it was somewhere hovering around $124 million. The defendants provide ISIS a comparable service, if not better service, for free. There would be no way for ISIS to reach out into Western Europe and recruit, or reach out into the United States and recruit fighters or people that are sympathetic to them that may have the desire to eventually commit terrorist acts. They could never do that without the defendants' services in this case. There is nothing in my mind that is more substantial to the rise in terrorism that we saw in the middle of the last decade. Which is kind of unusual here. You're kind of amalgamating all the different social media groups and saying together they're doing it. Does that work in terms of the liability or do you have to break them down one by one? No, we have to break them down pretty much one by one, and we definitely have done that in our first amendment complaint. But in terms of their substantiality? In terms of their substantiality, we also have to consider the fact that we cannot go through the perhaps hundreds of thousands of posts that are on each social media platform and put them in the amendment complaint. We do, for the purposes obviously of space, we need to limit what we actually have in there to prime examples. But we allege with sufficient plausibility, which is all we need to do under 12B6, to show that each one of the defendants is engaging in conduct that allows ISIS to recruit, radicalize, fundraise. Now let's go to 230. Now I understand that wasn't decided by the district court. It was not. Your argument that we shouldn't decide it? We're essentially going to decide that the general, I mean we have three cases here. It's going to be hard. We can't hide because we have Google and we're going to have to address it. Of course. You have to address it. Of course. And now that the cases are somewhat consolidated for purposes of argument, we definitely should. There's two ways of approaching, in my mind, the 230 issue, which is actually approaching the nitty-gritty of the actual conduct that is going on on these platforms, or to go with a very clear-cut statutory interpretation analysis. And JASTA, which is the statute that enacted 2333D2, which is the premise of the liability in these two cases, says and uses language that you will find in no other civil statute in the United States Code, which is that it provides a basis for relief that is the broadest possible, quote-unquote, broadest possible under the Constitution, period. They were talking about personal jurisdiction, weren't they? No. And, in fact, our position in our brief is that while they may have gone through an amendment process and adding that in there, the very fact that Congress took the personal jurisdiction language out only reinforces our position that Congress meant this statute to be enforced without our limits, which is the Constitution of the United States. In this case, what they clearly said is we must look at what Congress actually said. All right. Let's suppose we didn't think that. I understand you say it's not an implied repeal. It's something else. But it's at least a tough argument because you have this very strict provision and you have this, you know, auditory language, and that's about what you've got. So the question is what if we thought 230 was still there? And it applies. Did we assume that 230 did apply? If we assume that 230 does apply, we need to take a serious look at, I would say, two of the strongest sorts of conduct here that would negate 230 immunity, which is, one, Google's sharing of advertisement revenue with ISIS. There are plausible allegations under 12b-6 that that is going on. And I would also reference that. But, yes, that may, well, let's assume that could set at 230, but then you're bumped back into the substantial assistance problem and demonstrating that that amount of money, as opposed to, I mean, you're in somewhat good ground arguing all the connectivity was a substantial assistance, but therefore amount of money was given to ISIS. How is that substantial assistance? I will tell you our position is exactly what we said in our briefs. That is a question for discovery. That's what the federal civil procedure is for. When it comes to the actual amount of dollars that went from the revenue. As a wild guess, it's not going to be much money. We actually don't know that. I mean, it could be hundreds of thousands, perhaps millions of dollars. We don't know, and that's what discovery is for. I don't want to conjecture as to. What's your second argument? My second position, again, assuming 230 applies and going with that basis, is we need to take serious consideration of Judge Katzmann's dissent in force. Because what Judge Katzmann is saying is absolutely true. What these platforms are doing has nothing to do with publishing. And that's the touchstone. That's the phrase that we must have in mind in looking at 230. This is a publishing function. And that's not just an argument. How much room do we have to do that as a panel under Ninth Circuit law, given several different cases, which do seem to read 230 otherwise. Specifically, let's see. Dry it off. And also earlier cases, too. I'm sorry for the telephone. I think when it comes at least to dry it off, and more that case, the plaintiffs in that case were really trying to tag the platform with the illegality of the communication that was going forward between the decedent and the person that was trying to sell him the drug. What Judge Katzmann said and what I'm saying is that I don't care about the content between ISIS and whoever they're trying to radicalize through the friendship recommendation functionality in the decedent's hands. I care about the communication, the connection between the two. The knitting together. The knitting together. You call it a mosaic or the collage. So if I look at a screenshot, there's something that's third-party content that's uploaded, and it's a YouTube video, let's say, or it doesn't matter, for purposes of this hypothetical, if you would, a video that is produced and uploaded by ISIS, let's say. And I understand your theory to be there's this other stuff that's uploaded with it, some of which being linked, perhaps additional. Maybe they're trying to advertise a memoir of a terrorist, or I'm not sure what else you would advertise to go with it. Directions for bomb-making activities or fertilizer or whatever it is that terrorists want knitted together. But I think the point is sort of cut to the chase. You're saying that it's not just publishing to have an algorithm that knits together and connects this content, right? My contention is that it's not publishing at all. Well, part of it is publishing. Part of it is publishing. Part of it is the video that's just uploaded, right? That is sort of classic third-party content that is being disseminated, if you will, published, to use the verb that we're concerned about, right? I don't think you're denying that, are you? I'm saying it's more, and that's the problem. Right. Yeah, go ahead. Yeah, I apologize. No, no, that's all right. I think it is the more part, if I understand it, is the knitting together, the linking to other content. That's the other, the additional that's not just publishing, as I understand your argument. Exactly. Our position is very akin to, again, what Judge Kasman said. What the defense are doing is no different than if they had actually put their own message there to the viewer that says, hey, look at this guy. And no one would dispute that if the defendants had a message that popped up to the viewer that says, look at this guy. But we have this line of defense. It's not just dry off, but die raw. We have a lot of, can you hear me okay? I hear you now, yes. Okay. So you have roommates, Lawrence, Kinsey, Carafano, and then dry off, die raw, all of which seem to say that additional organizing material, adding the stars, asking questions, unless it is essentially adding or promoting the big galley, which is what roommates isn't outside of 230. And that may be questionable, but that's our case law. So the question is, if you need to come within that standard, was this content added part of the illegality? Again, I would say it's not necessarily dependent on the content. Again, I know what the affidavit term here we're talking about is, the publishing. But the question is, and that we are trying to answer here, is linking a viewer with another recommended viewer, is that publishing? It isn't. I would posit that it's not. But under our case law, isn't it? Counsel, right there, forgive me for interrupting, but under our case law, isn't this a neutral tool under our case law to match one user to another? I don't know how it necessarily could be neutral, because the algorithm is looking at the content of what these people are posting and talking about. But I think the argument is the same algorithm applies to Brooks Brothers. It says, somebody who bought this suit also bought this pair of shoes. It's the same algorithm applied. This content happens to be Paris videos. I think that's the argument. As opposed to in roommates where the questions being asked that had to be added were themselves, quote, illegal in the sense that they asked for considerations that you weren't supposed to take into account. So they're adding to the illegality. I think, if I may, I think the real critical distinction, now that I'm hearing Judge Berns and Judge Christian talking together, I think it's this. The algorithm is based on content. Our problem is not necessarily the fact that what the algorithm is basing its information on. Our problem is what the algorithm does with that information. It takes that information and then connects users. Yes, Judge Christian. Okay, so if the algorithm, if you could go back to my example, which is silly, but it might help illustrate. So if you have third party, what I'm going to call third party content, because it's a Paris video, and there's an algorithm that matches that up with a book about how to build a bomb or information about where to go buy fertilizer or some bomb component, that seems to me to add to illegality in a way that Judge Berns is describing, what makes it more illegal, more dangerous. But I'm not really sure that's what you're alleging. That's what I'm grappling with. Because there's separate sorts of recommendation functionalities that are going on. There is the friendship recommendation functionality and then content recommendation functionality. When it comes to the friendship connection functionality, again, the algorithm is basing the connection it's recommending based upon content. But our allegations and our complaints are saying it's a connection, it's a fortunate connection between an ISIS member and someone else on defendants' platforms. That is where it goes beyond community. Right. And so let's go to Dyroff where that's exactly what happened. Apparently this guy goes on to this interactive service thing and it connects him up with somebody to buy heroin from. I think, Dyroff, there is a slight difference, and this may be where the court can go beyond Dyroff. And that is it appeared to me from the opinion in Dyroff that the plaintiffs were still trying to hold the social media platform accountable for the actual content. And, again, assuming I'm taking your hypothetical. But the content was itself illegal. I'm going to sell you some heroin. So, again, that's the content of the actual messaging. What we're saying here is it's not necessarily the content of what the ISIS member is going to say to the person that they linked up with. It's the connection itself. That is the problem. That's what runs afoul of the ATA and JASA, and that's also what allows it to fall outside of 230 and me. I think there's two connections, if you could take this. I think you allege one way the algorithm works is to connect, in my silly fertilizer example, to other content. And another, I think, is to say, hey, a specific user, a user who liked that video and this video may be interested in these six other videos. Is that fair? I think if I understand you correctly, yeah. So that it offers so that YouTube is then suggesting other videos to the person who watched the first video. And, again, I don't want to come up with this concept and saying it was my own idea, but this is exactly what Judge Chapman was saying in fourth. It's almost as if the defendants are putting up their own message on the side of your screen when you're looking at content and saying, hey, look at this guy. Now, granted, that's not necessarily happening, but it's tantamount to that. And then why that conduct falls outside of 230 and meaning. But you've got to have liability first. What's your strongest claim? What's the strongest theory for secondary liability? Yeah, we only have one. We only have one. What's the strongest theory? Can you just walk me through your strongest theory? Aiding and abetting. You're not alleging conspiracy, right? Just aiding and abetting. Everything is gone except the secondary liability claim. And what I mean by that is the claim under 18 U.S.C. 2333 D2. That is our claim. And, again, just to emphasize how I opened up. And your claim specifically is that they were knowingly providing substantial assistance to ISIS, which is an international, which conducted this act of international terrorism, and in terms of the factors as to what knowingly substantial aid is, that the factors taken together are sufficient because we don't have to demonstrate a knowledge of the particular act because, in particular, that wasn't true in Afghanistan. It wasn't true in Afghanistan? And also to add to that, it was not true in Lind either. And Lind, the Second Circuit, specifically said that. And also the statutory text itself says that aiding and abetting must go to the person who committed the act of terrorism. That's the statutory text itself. Judge Gould, for a moment here. I'm sorry. I want to interject something on timing. You're seven and a half minutes over your time of 20 minutes already. But I think the panel's been engaging you with questions. And you should continue arguing until the judges are satisfied they've got answers. However, as an interim measure, if you could wrap up your argument by the I'll give ten minutes to each of the appellees. And if you need more than that because of the questions, the judges can ask for more. Sure. Just one issue that came up in Gonzales that the panel's not asking me yet, but I do want to address. And that's the First Amendment issue. I want to be clear. There is no First Amendment issue here. And I would reference the court to take a look at the Humanitarian Law Project opinion issued by the Supreme Court in 2012. And there the court really did address issues that was more of in a direct liability context. And to be even more specific, there was no civil claims there. It was the possibility of a criminal prosecution. But it still dealt with the operative statute, which is Section 2339B. And what the Supreme Court said there was when it comes to issues of terrorism, especially designated foreign terrorist organizations like ISIS, there is a compelling interest that the government is able to ensure that people do not provide, at least in that statute, material support. It's no different here. The First Amendment implications of 2333D2 are the same implications that you would find that were addressed by the Supreme Court in Humanitarian Law Projects. I'd reference the court there. And with respect to, again, assuming, let's take it outside of what Judge Berzon was saying on assuming 230 applies. Judge Berzon, you did make an interesting comment. You mentioned Halberstam, and that's not necessarily codified. But every court that has addressed 2333A or D, sorry, 2333D, must reference Halberstam. And I would note. I understand that. All I would say was this, that the statute holds up to the conclusion that the connection has to be to the person who carried out the act of international terrorism and not to the crime itself. But when you get to Halberstam, you seem to be running back to the principle violation, which I gather is a particular act of international terrorism. Presumably Halberstam can override the language of the statute, but is an exegesis of it. And as such, I mean, I think when you get into the nitty gritty of Halberstam, the six factors, it isn't really, it doesn't require knowledge of a particular violation as opposed to, as in Halberstam, a set of activities. In other words, I don't think Halberstam can change the language of the statute. And I was actually going more in the sense of the argument that's being made about the codification of the statute and whether it actually overrides, whether JASTA overrides 230. I apologize if I wasn't clear. Since we must reference Halberstam, and Halberstam is in the same section of the statute that says the broadest possible basis for the constitution alone, our position is that that cannot possibly be preambulatory language. That is an enacted portion of the statute. And in fact, it falls below the typical formula that Congress uses when it does enact a statute, which is being enacted by the House of Representatives and the United States Senate. Yes, but it doesn't override. I mean, on that hearing, you would override every procedural barrier, every other substantive rule that applies ordinarily and so on. It doesn't do that. It only says that you can seek relief. It doesn't say that we're changing all the rules. You can seek relief. And again, I'm just emphasizing the uniqueness of this language. There is no other civil statute that does it. I've looked, I'm sure opposing counsel's looked and maybe she's found. I still may have not, but Congress meant something when it said that. And every court that has addressed that language either has either declined to address it and its uniqueness, or they've said that somehow we were arguing an implied repeal, which we are not. And let me be clear to the panel. We are not arguing implied repeal by any stretch of the means. Implied repeal is just complemented with typical statute interpretation tools. One of them being, and this court has applied it several times, that the specific later enacted statute governs over the earlier general statute. And JASTA fits that criteria perfectly. It is the later enacted statute. It is the more specific statute. And in this particular issue, when it comes to interactive computer service providers, JASTA trumps 230 in its limited circumstances. Judge Gould, did you have a question? Yes. I have a comment. We've gone quite over the top. No, but that's all right. I asked you to do that. However, we're going to have to get to a conclusion someday. And therefore, what I'm going to suggest is, unless Judge Prezan or Judge Christin would like to ask additional questions now, we'll end your opening argument. And I'm going to give you three minutes of rebuttal in any event. Thank you. Hearing none, we'll proceed to the appellees. Now there are three appellees. And although it was initially thought we'd give them about seven minutes each, I'm going to give each of the appellees 12 minutes to respond to sort of equalize time. Thank you, Your Honor. Thank you, Your Honor. Presenting Judge Gould, Christin Lindsley for all three defendants. And I will be speaking by agreement with counsel and to make life simpler for the panel on behalf of all three defendants. My client is Facebook. And for Google and Twitter are on the phone. Mr. Willen remains on the phone for Google.  The plan, at least as it stands now, is for me to address the argument on behalf of all three. Okay. That's fine. I think I had your earlier plan in mind. So go ahead. And you can use the full amount of time. Let's let the clerk's office move that time up 24 minutes. Thank you, Your Honor. So the two remaining cases, APA cases before the court today, TANDA versus Twitter, which involves an attack on a nightclub in Istanbul, and Claiborne versus Twitter. And I say Twitter at all for both cases. They're Twitter, Google, and Facebook in both cases. Claiborne involves the San Bernardino shooting. And so those cases were decided by two different district judges. TANDA was decided by Judge Chan. Claiborne versus Twitter was decided by Magistrate Joe Thieler. And both of them ruled in favor of defendants and dismissed the cases with prejudice. And so both of those cases on appeal have been narrowed in a way that actually makes the court's decision somewhat simpler, although there are still a number of issues. First, the plaintiffs don't dispute that their claims fall within the substantive scope of Section 230 of the CDA. The only argument they have made in the brief is this JASTA argument. There was an implied repeal by JASTA. I will address that a bit later. That is not my understanding, and it's not what was argued now. My understanding is that that's one of their arguments, but they also argue that substantively 230 doesn't apply to the sort of what's called the matchmaking function or the referral function, and it also doesn't apply to the revenue sharing. Is that not true? Yes, I'm happy to address that, Judge Berzon, and certainly Mr. Weininger did argue that today, although the briefs did not make those arguments. So our position was in the reply brief that those arguments had been waived. The only argument that was made in response to the defendant's alternative basis for affirmance, which was Section 230, was the JASTA what I call implied repeal or abrogation argument, however you want to put it, statutory interpretation based on JASTA. But there's no argument in the reply brief that relates to those points that your Honor just mentioned, but I'm happy to address them, which I will do when I get to Section 230. I'm happy to address those points, and I do have some things I'd like to say in response. But our initial and baseline position has been that they've waived those points if they weren't mentioned in the reply. But let me turn to the merits. On the merits, the plaintiffs have narrowed their case, as we conceded a moment ago, to a single count for aiding or abetting us in each case under the civil remedies position. I would suggest that we concentrate on the fact that Tammi ran with Claiborne. Claiborne has all kinds of other problems with that. The fact that the connection to ISIS is lost. Yes. So I think that's an excellent idea, and I will do that. What I was going to say is I was planning to begin this case on what has been said. As we read the statutes, the defendant must have substantially assisted the act of international terrorism. And that's going to include a discussion of what is the act of international terrorism in this context, on these facts and on these allegations. And then I was going to turn to the facts. No, that's really not what I was saying, and I do think you need to address this. I was saying that as I read the statute, putting the Halberstam gloss on top of it, is that the connection has to be to the person who committed such an act of international terrorism, which in this case is ISIS. No? Correct. So let me address that, Your Honor. Is that correct? Is that your understanding? No. That they have to provide substantial assistance to, and the to is missing from the statute, which is there too, to the person who committed such an act of international terrorism, not to the ISIS. Our position, Your Honor, is that the substantial assistance needs to be provided to the person who committed the act of international terrorism in connection in some manner with the act of international terrorism itself. Our position is to read the statute as a whole, beginning with section 2333A, and also defining on Halberstam, which I'll get to in a moment, but just reading the text of the statute by itself. If you read A, it keys off of necessarily an act of international terrorism. So the plaintiff... Are you arguing that the birusing of language applies to D2? Correct. Because D2 incorporates A. It says for an act that, for an injury that a plaintiff that's bringing a claim under A, liability may be asserted against a person who, in connection with an act of international terrorism that was committed, planned, or authorized by a designated foreign terrorist. But here, I mean, certainly the person was injured by reason of an act of international terrorism, right? Yes. So we're not contesting that the people were injured by an act of international terrorism. And plaintiffs have alleged that the act of international terrorism, in this case, is in fact the nightclub attack in Istanbul. They've alleged that repeatedly in their complaints, that the Istanbul attack was an act of international terrorism. If you look at ER-169, it was an act of international terrorism caused by ISIS. 169-70 is one of the many places in the complaint that they allege that. So the question is, does the assistance have to be to the act of international terrorism? Our position is that given the entire structure of Section 2333, as amended by D, it keys off the act of international terrorism that causes the plaintiff's injury. The injury has to be in an action under Section XA for an injury arising from an act of international terrorism, committed, planned, or authorized by a designated terrorist organization. In this case, plaintiffs allege that in the Istanbul attack, liability may be asserted as to any person's age and effects by knowingly committing such an act of international terrorism. So the statute refers, and the language is emphasized, to the person who committed it. But by incorporating Halberstadt, it certainly does not say that the assistance to the person who committed the act of international terrorism is dissociated entirely from the act itself. The fact that Congress uses the word the person who committed such an act is clearly referencing that the assistance has to be in some way, shape, or form in connection with the act. Then Congress says, in finding number five, that the court has looked at Halberstadt v. Welch, recognized that it's a leading case for civil, defaming, and abetting and conspiracy liability as providing the proper legal framework for how such liability should function in the context of the statute. So then you look at what's the proper legal framework that is set out in Halberstadt. The test that's set out in Halberstadt, which is a widely applied test for aiding and abetting generally, both before and after Halberstadt, is that the defense jointly and substantially admits the principal violation in addition to the other elements that are discussed. And that test, the court made it clear. Assuming that much, it's clear in Halberstadt that the person, the heir and abetter did not know about, or didn't have to know about the particular violation, even the particular burglary, which was the routine thing or about the murder, which apparently hadn't happened before, but she was still responsible for both under the standards that were set out for aiding and abetting in Halberstadt. Right. A couple of things on that, your honor. First of all, the defendant in that case, Hamilton, specific findings had been made that by the district court and the DC circuit. It's correct. This is fine to serve the client. I'm having trouble hearing you. I'm having trouble hearing you. I think maybe you have to speak a little more slowly or a little more into the mic. I'm sorry. Is that better? I can, I can hear you. I'll try to speak more slowly as well. The district court in that case, specifically found in the DC circuit did not disturb these findings, but Hamilton was fully aware that she was assisting with some type of personal property crime at night. The court also, by the way, went out of its way to show that a common law, if you're committing a burglary and you are doing so under a common design and a common purpose, if someone gets murdered or some other wrongful act happens in the process, this is common for conspiracy liability, especially that comes within the contemplation of the conspiracy or perhaps an aging and abetting plan by agreement. So in that case, the focus was on the burglary, not the murder, not that she would have had to know about the murder. She would have had to know that he was committing a burglary. And the court, for Hamilton, that it just wasn't plausible for her to claim that she did not know what he was doing every night when he went out. After the fact, she was an accessory after the fact to everything he was doing. As Judge Curtis has pointed out, she was laundering the stolen goods, doing transactions in her own name to do that. Night after night, he was bringing more goods in and she was laundering them. She was filing false tax returns that didn't reflect that, that didn't reflect the nature of the crime. And the court found that to be substantial assistance as well. In short, she was substantially assisting a person that she had a close relationship with, with a common design, a shared goal of amassing personal wealth. So what, what I think I would, how I would view Halberstam is that the Congress called out, this is the proper legal standard. The legal standard is the three elements the court identified, the principal wrong, the awareness of knowledge of a general, or general, that your, your assistance is, is assisting a general course of wrongdoing. And then the, the knowing and substantial assistance in the primary wrong. Here, the court appeared to view the primary wrong as a series of burglaries that were occurring. But the fact is, as Congress said, proper legal framework, it needs to be applied to the facts of each case. And the facts here are nothing like those in Halberstam. Whatever the court, caused the court to come out the way it did there. In that case, it was a close and intimate partnership between two wrongdoers working toward a common goal of amassing wealth and theft, laundering of stolen goods and concealment. And the court just concluded that that was sufficient to meet the test and affirmed the district court's conclusion on both that and on the conspiracy where the court found there had been a tacit agreement to commit these acts together. So I, the operative test though, is still that set out in Halberstam. The combination plus the six factor test by which you can judge whether or not there was. You were here, you were here. Go ahead. No, no, no. I didn't say counsel. What would be helpful to me? And I appreciate you running through that, but what would be helpful is you heard him opposing counsel respond. I said, so take your best shot. What is your best shot? Secondary liability. And you heard him explain how he thinks the defendants, did aid and abet. Right. And so if you could, could I hear your response to that? He's saying is, if it weren't for this global communication platform, Isis wouldn't be what Isis is. And then Google was aware generally of its role in Isis's scheme. Could you respond? Yes. Let me respond in two ways, Your Honor, if I could, because there's two conceptions of what would need to be aided and abetted. Our initial position is, and has been, that the substantial assistance needs to be to the act of international terrorism that injured the plaintiffs. Both under the statute and under the laws that Congress put on it in Halberstam. There's no way. First, as I understand it, I think the two collapse into one in the following way. Looking at Halberstam. Let's suppose that Google knew that Isis was, you know, conducting these lots of acts of international terrorism, one after another, which is sort of in the complaint, and that they were doing so by using the platform, and that I'm using Google, but whatever the legal company is, in a way that we have to get a 230 issue, but in a way that otherwise is actionable. And that, let's assume for the moment, in some ways, that it was substantial. It really, you know, was a really necessary part of conducting their activities. So, so now they've done international act of terrorism, A, B, and C, and now they're going to do D, which is the one that's an issue here. Halberstam. That can sufficiently show, knowingly providing substantial assistance to the person who committed an act, with regard to the principle violation, even though there's not a specific prior knowledge of the particular act. Is that wrong? Yes, Your Honor, we do not believe that that is what the plaintiffs have alleged. They've repeatedly alleged in the complaint that the act of international terrorism that they are complaining about, was the underlying terrorist act that injured them. The question is whether they had to know about that act, or they had to know that there was a whole program to do these acts, which was supported by their platform. And this was one of them. Okay, well, let me speak to that. Your Honor, we, our position is that even if you disagree, that section two,   three D must be read by reference to the underlying act of international terrorism, that injured the plaintiff, there's still not substantial assistance to ISIS, even at a general level. So, let's start there, and posit that the substantial assistance that the plaintiffs are talking about, for purposes of Halberstam, would lead to the principle violation consisting of, using the facts of Halberstam, a series of terrorist acts, of which this latest one would just be the last in the series. So, the difficulty there is that plaintiffs still have to show substantial assistance in that activity, by reference to the six factors called out in Halberstam. So, let me just walk through those. But the fundamental, the fundamental problem with that thesis, is that there is no, that plaintiffs do not and cannot allege that there was any design by the plaintiff, to further terrorist ends. That what defendants are accused of doing, over and over again. The statute says knowingly and substantially, it doesn't say intent or motive. But what I was going to get to in walking through the factors, is that there needs to be some purposefulness, vis-a-vis the underlying wrong, even if you view it as a series of wrongs. And here, what the plaintiffs have alleged, is that the defendants all prohibit terrorist content on their site. That they take down content when they see it, when they're alerted to it, and that they have done so on multiple occasions. And throughout the complaint, and we've documented this in our briefs, and I have to say- But where are you getting the intentionality provision from? It's not in the statute. Is it in Halberstam? I'm sorry. Where are you getting the purpose or intention? Well, it's certainly- It's not in the statute. It's certainly in Halberstam, and there's two factors. There's three places where intentionality occurs. One is knowingly and substantially assisting the principal violator. It's not an intent. But the problem is, if all you're doing, and the banking case is going to show this, if all the defendant is doing is providing routine services and not singling out some person not to receive that service, for example, routine banking services, this is repeatedly held, and we've cited these cases in the briefing, that if the service is a routine service and the only allegation is you're providing it to an organization that might be a terrorist, or in some cases, it's provided knowing that it might find its way to a terrorist organization, that's not enough. If your only allegation is that the defendant has not cut off services to that, that's not knowing and substantial assistance to the wrongful act. Let me just walk through the factors. We have nature of the act involved, amount of time- Can I ask a question? Are you going to address 230 at all here? I don't want to do that. No, no. I'm happy to address it. I was just trying to address the aiding and abetting first. I was going to get to 230, yes. The Halberstam factors, the first and second, look to the defendant's encouragement of the wrongful act and require that the defendant have played a, quote, major role in prompting the court, or have been integral to the complaint. Nothing in the complaint alleges that the defendant here played a major or integral role in prompting or carrying out any terrorist attack committed or inspired by ISIS, much less the ones that are currently before the court, or took steps to encourage such acts. The plaintiff devotes hundreds of paragraphs documenting the rise of ISIS since its origins in the late 80s. They assert that ISIS supported- Where is this major role language that you're talking about? It's in the Halberstam. Be aware of his role as part of an overall illegal or tortuous activity, but I don't see major. I believe it's in the discussion of the facts of Halberstam. Why not? All right, I don't think it's there. Why don't we go on? Yeah, it may have been spoken and put in quotes around that, Your Honor, so I apologize for that. So the first and second factors look at the defendant's role in the alleged tort. And here, although plaintiffs cite paragraphs documenting the rise of ISIS and allege that ISIS used social media sites to build its power base and recruit and conduct other activities,  took any affirmative action to actively assist or encourage ISIS in carrying out terrorist acts. Again, they allege that defendants should police their anti-terrorism policies more effectively. But that is not in the vetting, and that is not substantial assistance under a long line of cases where courts have addressed the neutral application of policies such as routine banking activities. And in this case, what you have is defendants taking steps to take down terrorist content as plaintiffs repeatedly admit and to take down terrorist accounts. So you don't have the defendants acting in any purposeful way to assist in the terrorist act. The third, fourth, and the sixth factors. All right, so wait a minute. So we're dealing with the Halberstam factors, right? The nature of the act encouraged the amount of kind of assistance given in the defendant's absence or presence, relationship to the tort actor, and the defendant's state of mind. The defendant's state of mind is one of five factors. It is not a necessary factor. Assuming the state of mind is their intent. And then they had the sixth factor, which is duration. So I don't see where you're getting this intent from.  The purpose or the intent or the motive? Well, the best you can do is have it be one of six factors. Maybe. But it's an important factor because otherwise it's not a necessary factor. It's not an essential factor. It's one of six factors. Your Honor, I think that both the banking cases and the cases dealing with that factor would support the proposition that if defendants are actively taking steps to take down terrorist content and claim it's a myth, it can't be said that the defendants are substantially assisting a course of terrorist activity, a series of terrorist acts. There's not a single allegation in the complaint that alleges that. The fifth factor, and Halberstam talks about this, that the intent factor, were defendants one in spirit with ISIS? Because that's what the Halberstam at page 484 talks about, whether the defendant in that case was one in spirit with Welch who was out committing the wrongdoing. She was actively involved in helping him ponder the stolen goods and conceal the wrongdoing. The language in Halberstam is, first, evidence as to the state of mind of the defendant may also be relevant to evaluating liability. In another case, they had sharing of the battery and so on. Right. So it's not an essential factor. It's an essential factor in the sense of knowing and substantial assistance. It has a meaning beyond itself. It has a meaning that is directed to the underlying wrong. There has to be some culpable intent going to a knowing, persistent underlying act. But I need to find it and I don't see it. It's not in the statute and it's not in Halberstam, so where is it? Well, that, again, there's two elements. The knowing element that is in the statute and that is in Halberstam knowingly assists the principal wrong. There's also substantially assists the principal wrong. Both of those things have to happen. And even if you view knowingly assist as relating to ISIS, you need to knowingly assist ISIS. And there's no allegation that the defendants have done that in any way that is consistent with an intent or a knowledge of helping ISIS with particular acts of international terrorism. There still has to be an act of international terrorism at that issue that the defendants are knowingly assisting in some fashion. So, and the fifth factor in substantial assistance does take in a kind of knowledge because it's important that the defendant not simply assist in some general way but have knowledge of what they're doing is furthering an act of international terrorism. It seems to me the strongest argument is one I'm not sure you're making, but maybe you are, but there's these three steps in Halberstam and the middle one is that Google must have been, the defendant, must have been generally aware of its role in the overall scheme. The third prong of Halberstam has to be something different or more. They don't collapse into each other. Right, exactly. Explain that. Because I do have, we did look into that because I found it a little bit perplexing that you had those two different ways of stating intent. And what I learned is if you look at Halberstam, Halberstam cites a few cases to explain that element. And what I found in going back and looking at the cases that were cited in Halberstam, we make this point in a footnote in our brief. Investors Research versus SEC, a DP circuit case is Woodward, which is a fifth circuit case, both cited in Halberstam, explain how that element came into the test. What happened is you have security cases where the original test had been knowing and substantial assistance of the underlying wrong, including in a criminal context. And in some cases, a third party like a lawyer may have helped the defendant commit something that turned out to be securities fraud by drafting the practice or doing whatever. But that lawyer may not have known that what was going on was illegal. That person may not have known that the state was involved, that the lawyer was drafting. So the court grafted on this additional element to make it an additional intent element that even if you knowingly and substantially assist the act that turns out to be the wrong, you also have to be generally aware that your assistance is furthering the course of an activity. So that's what Investors Research and Woodward explain, and those are cited in Halberstam for that element. So that to me was helpful to know, like why do they have these two different ways of expressing intent, one of which being fraud. So I hope that answers your question. Getting back to the, and have I answered Judge Berzon's question? I want to make sure I have. Before I go back to, I was going to go back to the factors, but I can also just. I understand that you've answered it, I just don't see where the intent requirement is, but why don't we go to 2.30? Let me first address the argument that plaintiffs do talk about in their brief, which is implied repeal. There's, first of all, the court has made clear in the ethics decision and other decisions, the Supreme Court that is, that if your argument is that a later federal statute abrogated or changed or otherwise took out of commission an earlier federal statute, the only available theory is implied repeal. There is no alternative theory for arguing the effect of a later federal statute on an earlier one except for obviously amendments, which is what we're talking about here. So that's the ethics decision and other decisions, like Branch v. Smith. But what plaintiffs have tried to argue is that we're not really arguing implied repeal, we're just arguing traditional principles of statutory construction. And they cite a case called Acosta and Juvenile Now. But in both of those cases, the court is citing Supreme Court precedent on implied repeal. In fact, the case that they cite, Smith v. Robinson, I believe, was a Justice Brennan opinion, where the question was if you find, implied repeal requires there to be a conflict. The subsequent statute can't be reconciled to the earlier statute. Once you find that the two statutes can't be reconciled, then you proceed to decide what rule of construction to apply. And only then do you say that you're going to apply the narrower and or later enactment. That's the rule that plaintiffs say they're arguing, but that is an implied repeal concept. It only comes into play once you've gone through the critical steps about implied repeal where there's this irreconcilable concept and that that was clearly what Congress needed. In other words, Smith was a later statute, to O-fung, to abrogate the earlier one. And in both of those cases, juvenile mail and a cockpit, that was in fact the case. The court had found that Congress meant to do that and there was a direct conflict. So we're into implied repeal, and here there is no irreconcilable conflict. Because as I think has been noted, a Justice doesn't say anything about Section 230, it doesn't say anything about Interactive Computer Services, it doesn't say anything about online content. And what it does is it's creating a different form of liability. It's creating aiding and abetting liability that wasn't available before. Section 230 provides an immunity or a defense. And as the court in the Second Circuit explained in force, it's just the normal operation of a liability provision and a defense in the form of immunity. So there's no intent to repeal and there's no conflict between the two. So you don't need to reach the subsequent question that the plaintiffs have raised. So that's implied repeal. And then I'll just turn quickly to the merits. I think Mr. Willen covered most of the points, but I did want to make a couple of additional points. One of which has to do with whether the arranging of, the recommending of content, sort of taking on Judge Katzmann's defense as a starting point, I think probably the easiest way to understand it, is that somehow different from publishing. And we would submit three points on that. First, that the arranging of content and recommending of content by arranging it is exactly what publishers have done for eons. And that is, a good example is, you're going to post certain news in the Western edition of the New York Times. That's the one we get. And that's going to be more toward California and the West Coast news. So they're going to be prioritizing certain stories because they know those readers will be more interested in those stories than the ones in Western. But you don't tell in that situation that New York Times is a content provider. It's providing content. What you're trying to do here is to say that by doing that, you're not a content provider. There's no doubt that the New York Times is a content provider, so the problem doesn't arise. Here, there's a publisher provision, which is a very weirdly worded provision that just says you shouldn't be considered a publisher. And then there's the provision that says that, but if they're a content provider, that's different. So the question is whether by doing what they're doing, they are now a content provider and not just a publisher. Isn't that the question? Right. By selecting the stories that get shown, even if they're third-party stories, it is a content provider. Yes, they're selecting them for the person. I'm having the person select them. In other words, but when they're simply a platform, the person goes and says, I want to see X, and then they see X. But now they're saying, well, if you're seeing X, you should also look at Y. So why isn't that content? Why isn't there a message there? I mean, go look at Y. Well, because it's no different. I guess that brings me to my second reason, Your Honor, and that is that I would still say that's a classic publisher function to say you look at this, you might want to look at that, or even just having an automatic matching of content. You look at this content, and this content is also liked by people who like the first thing you look at. So that routes that additional content to you. But even if one might say, well, gee, that's not publishing, I would still say it is absolutely covered under circuit precedent. As Your Honor mentioned, you have dialogue. You don't only have dialogue. You also have roommates. Roommates are incorporated. Tarifano, you also have Daschle, you have Kinsey. Tarifano was sort of incarcerated in roommates, but roommates, yeah. Well, roommates did re-characterize it, certainly, but it re-characterized it in a way that makes it applicable here to suggest it matches people, which is exactly what Tarifano did, but that's how roommates just describe it. And roommates itself talks about arranging and prioritizing content. That's exactly what Tarifano does. Counsel, Ms. Gould, I'm going to apologize for interrupting your answer to Judge Berzon's last question, but I think we're almost 11 minutes past the 24 minutes that was put on the clock. Although I asked them to put, I wanted them to put 36 minutes on the clock for you to equalize things so you're really close to your full time but not over it. But if you could conclude your argument in the next five or six minutes, then I'm going to give the other, the rebuttal option of several minutes to Mr. Weininger, but at some point we do have to conclude these arguments for everybody's sake, and we will be able to ask for supplemental briefing. If the court wants it, we'll be able to say that the party planted for defendants can file a motion to file a supplemental brief. They feel they need to, but for now, let's try to close this within five or six minutes. Yes. One quick point about Dyerock, as you said, I think that the suggestion was Dyerock was just a claim based on content. That actually wasn't true. Dyerock's claim was for wrongful death for a plaintiff's son who had died of heroin overdose. So that was very maldictive of the case, and I think it's difficult to get around the whole thing with Dyerock, which is fully unlawful work. And the other point I'd like to make is that going back to the- unless the folks have other questions about CD8 and 30 as applied to here, I think we've covered quite a bit of that in the two arguments. Just going back to aiding and abetting for a moment, I think my fundamental point is that plaintiffs do not allege, if you look through their complaint carefully, they really don't allege that defendants played any actual role in terrorist attacks. They don't allege that. They allege that ISIS was able to build up its power base to become stronger, to become a global organization. Most of the allegations date from 2014 and earlier. They don't allege any persistence by the defendants in any actual terrorist attacks. They make some vague allegations with respect to DT that defendants' social media services were used, but plaintiffs never provide any substantiation to the idea that any of the defendants' services were used in any fashion in connection with the commission of these attacks. And yet, much less that the defendants themselves as entities somehow assisted, as opposed to ISIS using their tools without their knowledge, intellect, or the facts. Even that is not alleged. None of those things is alleged. The only connection to the defendants' services that is alleged in connection with these attacks or even other specific attacks is in Claiborne, where the plaintiffs allege that one of the wrongdoers, the perpetrators, Malik, used Facebook to post her allegiance and that of her husband to the ISIS leader. It's unclear when that was supposed to have occurred. The complaint says it might have happened before, it might have happened during, it might have happened after, but that's not enough. Imagine Judge Wheeler held clearly that is not substantial assistance in the actual commission of any terrorist attack, including the Sanford and D.C. ones. So that's, I think, where I'd like to close, and let us support other questions on those points. Judge Perzan, Judge Grist, hearing no requests for questions will prevent Ms. Lindsley to close with thanks. So we thank you. Let me just make a final comment. This case shall now be submitted. However, if the panel on discussion feels it needs supplemental briefing on any particular point, we'll file an order to seek such briefs. And furthermore, given the unusual circumstances of the argument today, I would also encourage any counsel to call for the, I misspoke. It's not submitted. We're going to permit a rebuttal argument. After that, it will be submitted. But once it is submitted, the panel can call for supplemental briefs so the parties can file a motion for a leave to file one. So why don't we thank Ms. Lindsley again, and we'll go back to Mr. Weininger. Thank you, Your Honor. Thank you, Your Honor. Mr. Weininger, everyone was over their time today. I guess I'm a poor presiding judge compared to what I recall Chief Justice Rehnquist doing at the Supreme Court back in the olden days when he would stop the mid-sentence. So we're not going to do that, but we would like you, if you can, to handle your rebuttal argument in the next five or six minutes. Thank you, Judge Gold. I just want to emphasize that intent is nowhere in 2333-D. Intent is nowhere in Halberstam. It's just that requirement for mens rea is not there. The reason why, I want to make sure the panel has worked on this issue, the two mens rea requirements. The reason why there's two mens rea requirements is an issue I think that Linds in footnote 10 in the second circuit opinion really hammered home on, and it's important, which is that the mens rea in the six-factor test deals with a situation where you may have more than a simple general awareness of the overall tortious or terrorist activity. But if you have more than that, that plays a role in factor five in Halberstam. And that's exactly what the second circuit said in footnote 10 of Lind. It's there so that you can use that as almost like an aggravating factor in sentencing, but it's not required. What is the bare minimum is that you have general awareness of the overall tortious conduct and terrorist activity. Judge Christin, I want to address a concern that you've raised, and I want to make sure I understand it properly, which is the interaction between 2333A and why it's mentioned in 2333D. And that is this. We were to assert a claim, and let's say we're the Tamnay plaintiff strictly. Let's say we assert a claim and we could and recover against ISIS. We would file that claim under 2333D direct liability for the attack. But since we don't do that because we couldn't recover against ISIS, because they would get personal jurisdiction over them, we are permitted to file a claim under 2333D for the quote-unquote person, in this case the defendants, who provided substantial assistance to ISIS. And that's where 2333D comes in. Yes, I understand where JASTA comes in, counsel. It's just that D incorporates, and the springboard for D is A. That's all. Right, right. So in other words, all that section of 23D is saying, the section that mentions 2333A, it's just saying this is a predicate action you need to have in order to have aiding and abetting liability. And we satisfy that predicate action because ISIS committed this attack. ISIS is the primary actor. In this case, it's less important. But the point is, we're trying to figure out what is the principal act? What are we talking about? And in the previous case, that sort of grew and expanded over the course of the argument. In your argument, you were clear from the beginning what the principal act is, and you said, I think I said, period. Is it just the shooting, the rain of shooting? And I don't mean just in any kind of minimizing way, but you were very clear that's your principal act. So I get it. Thank you. With respect to the argument that I made about who the person is, it's important to recognize that in 2333D1, Congress referenced the general term statute, 1 U.S.C. 1, as to what a person is. And a person can be an association, a society, and it can be a collection of individuals. And if you take a look at the statute that the Secretary of State must follow to designate a foreign terrorist organization, and that is Title 8 U.S.C. 1189, you must at least have a foreign organization to designate. And if you cross-reference what an organization is, the nearest comparable statute I could find was 18 U.S.C. 2386, Big A. And there it said that an organization is exactly the way person is defined in Title 1 U.S. 1, which is it could be an association, a society, a collection of individuals. I think we appreciate all this and it's in your briefing. The reason I think several of us have been harping on trying to get folks to focus on the elements of these statutes and the factors and whatnot that we have to apply, but I'm not sure any of the lawyers necessarily appreciate that from our perspective, the briefing wandered a bit and conflated sometimes. And so that's why we're really looking very carefully at which are direct liability claims, which are secondary liability claims, and so forth. But I found your argument and all the arguments there to be very helpful. That's why we're trying to be more precise. Sure. And that leads me to my next point, which is what opposing counsel mentioned, the language of by reason of. And I'm sure this is unintentional, but it's conflating several issues. By reason of is the causality language in the statute in 2333A. So it has nothing to do with substantial assistance. By reason of... I think people are really clear on that. You're clear on that. Fine. And the other thing I want to also hammer home on is when the defendants reference the measures they are taking to take these items off of the platform, that's an issue for discovery. And I will just close by saying this is 12B6. This is just issues of plausibility. We need nothing with particularity. This is not a rule of mind case. And there are issues that are factual that can be resolved in discovery, and that's exactly where these cases should go. They should go on to discovery. Unless there's any further questions, I'll rest my time. Okay. Thank you. We thank you for your excellent arguments and for concluding. Okay. We will conclude now. Will Judge Berzano, Judge Christin, have a question? No. Hearing none, today the argument shall be concluded. And this case is submitted. But I want to add two comments. The first is that, as I said earlier, the panel may, if it wants to, call for supplementation on briefing, or any party may move for leave to file a supplemental brief, which will probably not be very important unless it addresses one of the questions raised by a judge at counsel at argument today. So, therefore, this case is submitted. The final comment is just to thank everyone for cooperating with our program here. First, I thank the IT staff and other court staff of the circuit for putting this together so we could pull the arguments despite the restrictions on our households and individuals. And I thank the counsel for the same. It's very difficult to argue in these circumstances without, as I recall, from law practice, having a troupe of associates sitting at the table with me when I made an argument who could hand a paper to me if I missed it. All the counsel have done a great job today presenting their clients' cases, and the court appreciates it. This matter is concluded, and the court shall adjourn for the day. Thank you. All rise. This court for this session stands adjourned.
judges: Gould, Berzon, Christen